Filed 3/27/24  P. v. Mason CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>ANTHONY MAURICE MASON,<br><br>        Defendant and Appellant. | A166353<br><br>(Solano County<br>Super. Ct. No. VCR229101) |

Defendant Anthony Maurice Mason was convicted of two counts of continuous sexual abuse of his two daughters.  He maintains the trial court abused its discretion in admitting certain expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) and improperly instructed the jury on that issue, and, cumulatively, these errors were prejudicial.  We affirm.

## BACKGROUND

The details of defendants' molestation of his daughters, T.M. and L.M., are not relevant to the claims he raises on appeal.  Defendant committed various acts of sexual abuse against T.M. and L.M. over the course of several years when they were under 14 years old.

1

At trial, a clinical psychologist, Blake Carmichael, testified as an expert on CSAAS and child sexual abuse disclosure.[1]  CSAAS is a tool to help educate people about children who have been sexually abused and to dispel myths about how children who have been abused behave.  There are five components to CSAAS: (1) secrecy, (2) helplessness, (3) entrapment or accommodation (coping), (4) delayed, conflicted, and unconvincing disclosure, and (5) recantation or retraction.  CSAAS is "not used to determine if a [particular] kid was abused or not."

Dr. Carmichael testified he did not know anything about the facts of the case, had not read reports or interviews related to the case, and knew nothing about the specific victim in the case or the relationship of "the victim" to the defendant.  He testified at length about each of the five aspects of CSAAS and how those factors relate to disclosure of sexual abuse.

The jury convicted defendant of two counts of continuous sexual abuse of a child.  (Pen. Code, § 288.5, subd. (a).)  The trial court sentenced him to a total term of 50 years to life.

## DISCUSSION

### *Admission of Expert Testimony[2]*

Defendant claims Dr. Carmichael testified to matters that exceeded the permissible scope of CSAAS evidence, constituted inadmissible profile evidence, inappropriately incorporated the specific facts of the case, and was improperly "quantitative."

---

[1]  We discuss defendant's objections to specific aspects of Dr. Carmichael's testimony in further detail below.

[2]  We review a trial court's decision to admit expert testimony for abuse of discretion.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

"Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*), quoting *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see *McAlpin, supra,* 53 Cal.3d at pp. 1300–1301.) CSAAS testimony is admissible " ' "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," ' " such as delayed disclosure of the abuse." (*Sedano*, at p. 479; *McAlpin*, at pp. 1300–1301; *People v. Ramirez* (2023) 98 Cal.App.5th 175, 215.)

*Challenged Testimony*

While defendant acknowledges CSAAS evidence generally was relevant and admissible in this case, he challenges specific testimony responding to questions asked by the prosecution.

First, in response to questions by the prosecutor, Dr. Carmichael testified: "[M]ost people who commit sex offenses are men" and the "vast majority" of child sexual offenses are committed by someone the child knows, who is in "an ongoing, trusted future relationship [with the child] that is continued to be maintained while the abuse is occurring and even thereafter."

Second, in response to the prosecutor asking whether the "non-abusing" parent being "out of the house a lot or not present" could contribute to the concept of secrecy, Dr. Carmichael responded: "I would tend to kind of capture that with the second component, the helplessness, because even if there's people in the child's life that you would think they could tell or should tell, if that other person is not available because they work a lot, they're drinking or otherwise unavailable, that leaves a child more isolated or in a helpless position. They rely on other people for their safety. Kids cannot be

3

viewed as mini adults and being the same kind of assertiveness to make things stop.  So people in the child's life who otherwise are responsible for their safety are not available, not around or the child feels like they just can't tell them for various reasons, that can maintain secrecy for long periods of time."  When asked again about the effect of the "non-offending" parent being absent, Dr. Carmichael confirmed the other parent being physically absent "absolutely" could have an effect on helplessness, but added, "again it's a misconception that just because someone is there the child would be able to tell.  It's if the child feels that person would be ineffective and/or they are actually absent, again leading this helplessness to grow even greater."

Third, in response to the prosecutor asking whether "the size of the perpetrator" can affect the concept of helplessness, Dr. Carmichael answered: "It certainly can.  Again, feeling intimidated physically without speaking a word can cause that helplessness to grow."  Asked whether the role of the perpetrator in the family can affect helplessness, Dr. Carmichael testified: "Sure.  The closeness the child feels, again the role and authority figure, even people who have, um, influence on the child's future, like we talk about coaches and playing time is related to pleasing a coach.  Well, if the child feels like they're doing something to make the coach upset or get them in trouble and they're seeking, you know, playing time or even a scholarship at college, you know, compromising those opportunities by saying something is something kids weigh heavily.  So, again, the role, the size and stature within the relationship are all being considered."

Fourth, in response to the prosecutor asking about a child describing sexual abuse but appearing "to smile or be in a good mood," Dr. Carmichael stated a child could be "distancing oneself [from] those negative emotions. You know, kids giggling because they're uncomfortable.  They feel nervous.

4

So maybe cracking a smile or trying to again deal with that nervous energy in different ways. So it's not unexpected that a child who has been sexually abused to be uncomfortable and kind of lets that nervous out with giggling or something like that."

Finally, in response to the prosecutor asking why a "non-offending parent" who becomes aware of abuse might not tell anyone, Dr. Carmichael stated: "So the parent themselves may be ashamed of it, but they also have a relationship with the perpetrator they're having to manage. They may rely on that person for finances, a home, be in disbelief that someone who is supposed to care for the child would even do such a thing. Pretty common reaction of kind of the bewilderness [*sic*] when at first something like that comes up. Those are reasons why a non-offending parent or a person in the child's life may not talk about it or even believe it."

*Permissible Scope of CSAAS Evidence*

Defendant maintains these portions of Dr. Carmichael's testimony exceeded the scope of permissible CSAAS evidence by focusing on the characteristics of the perpetrator and the behavior of the "non-offending" parent rather than on children's general reactions to sexual abuse. That is not an accurate characterization of Dr. Carmichael's testimony.

Rather, Dr. Carmichael's testimony was appropriately directed at helping the jury understand common misconceptions about child victims of sexual abuse. His statements that "the vast majority" of children are abused by someone they know and are in a trusted relationship with, rather than a stranger, elaborated on the context in which such abuse generally occurs and dispelled a common misunderstanding as to the relationship between child victims and their abusers. (See *McAlpin, supra,* 53 Cal.3d at pp. 1302–1303 [one of the popular notions requiring correction is that " 'The layperson

5

imagines the child offender' " to fit particular stereotypes, including that the offender is " 'a stranger' "].)  This testimony also helped the jury understand child-victim behavior.  Dr. Carmichael testified child sexual abuse "is occurring within a relationship where they often know the perpetrator, care about the perpetrator, oftentimes has a loving relationship with their perpetrator.  And so it's within that context the child is experiencing the abuse and grappling with the ideas of what might happen if I did tell."  Dr. Carmichael further explained people who commit sex offenses "identify victims and their vulnerabilities and their trusts" in order to build a relationship with them, maintain secrecy, and "secure a trust so that a sexual touch is integrated into those relationships . . . [and] becomes familiar and normal for this to occur in that relationship."  He added, based on research in the area of child abuse, "the relationship the child has with their perpetrator" tends to result in "longer delays in telling about it" because a child victim weighs the consequences of disclosure and "feels responsible for the negative impact on those around them that also affects the perpetrator."  In sum, such testimony falls well within the ambit of permissible CSAAS evidence both to counter common misconceptions about child sexual abuse and explain why child sexual abuse victims may delay reporting abuse.  (*Sedano, supra,* 88 Cal.App.5th at p. 479.)

Similarly, Dr. Carmichael's testimony that the majority of child sex abusers are male was offered in response to a line of questioning about the research on how child sex abuse victims act and disclose abuse.  He explained the gender of the abuser can affect the way children tend to react to abuse "because of the differences between men and women and then also the child victim and the role that they have in that relationship."  Dr. Carmichael's testimony about the physical "size" of the perpetrator, the perpetrator's role

6

in the child's life, and the physical absence of the "non-abusing parent" were also appropriately discussed as circumstances contributing to a child's feeling of helplessness and reluctance to disclose abuse.

As to Dr. Carmichael's testimony about reasons a non-offending *parent* may not report abuse, similar expert testimony was held admissible in *McAlpin* to explain why a mother did not report her daughter's molestation to the police. (*McAlpin, supra,* 53 Cal.3d at pp. 1301–1302 [rules applicable to CSAAS evidence applied equally in the context of the failure of child's parent to report molestation].) But even if such testimony exceeded the permissible bounds of CSAAS evidence, it was not prejudicial to defendant's case. The testimony was extremely brief, based on generalities, and offered nothing specific to suggest defendant's guilt. Accordingly, any error in admitting this response was harmless. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [erroneous admission of expert testimony only warrants reversal if it is reasonably probable more favorable result would have been reached in absence of error].)

*"Profile" Evidence*

Next, defendant maintains the challenged portions of Dr. Carmichael's testimony constituted improper "profile" evidence that invited the jury to convict him based on common characteristics of an abuser. That is not the case.

"Profile evidence is generally inadmissible to prove guilt." (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084.) "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime." (*Ibid.*) In *Robbie,* the prosecution questioned the expert witness with hypothetical questions incorporating the defendant's specific alleged sex offender conduct. (*Id.* at pp. 1083–1084.) The expert testified such behavior

7

was "typical of a particular kind of criminal," and described the defendant's conduct as the " 'most prevalent type of behavior that I've seen with sex offenders.' " (*Id.* at p. 1084.)

Here, however, Dr. Carmichael's testimony that most child abusers are male, have a close relationship with their victims, and are adults physically larger than the children they abuse, described only attributes that *generally* apply to child sexual abusers. It did not purport to describe a "profile" of a "typical" abuser with defendant's specific characteristics who engaged in the "specific alleged sex offender conduct" in which defendant allegedly engaged. For example, defendant's assertion that Dr. Carmichael's testimony about the perpetrator's role "in the family" was improper "profile" evidence was based on a hypothetical example of a coach who plays an important role in a child's life, a circumstance not remotely present in this case. (See, e.g., *Sedano, supra,* 88 Cal.App.5th at p. 483 ["The category of people 'who have an existing relationship with the victim' is a category so broad and nebulous that it cannot be construed as a 'profile' that would lead a jury to convict just because defendant falls within it."].)

*Too Fact Specific*

Defendant also maintains Dr. Carmichael's testimony was impermissibly focused on the specific facts and circumstances of this case, rather than the general class of child sex abuse victims. Again, defendant's argument lacks merit.

Generally, it is improper for an expert to testify about CSAAS in a manner that directly coincides with the facts of the case. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 393 [expert may not give " 'general' " CSAAS testimony in a way that allows jury to apply CSAAS to the facts of the case and conclude the child was sexually abused]; *People v. Jeff* (1988)

8

204 Cal.App.3d 309, 338 [expert's testimony based on series of hypothetical questions that incorporated "the exact same facts and details" as told by victim to social worker improperly conveyed that the jury should accept victim's version of events as true]; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384 ["better practice" is to limit an expert's testimony "to observations concerning the behavior of abused children as a class" and "avoid testimony which recites either the facts of the case at trial or obviously similar facts"].)

Here, Dr. Carmichael testified he did not know any circumstances of the instant case. The prosecutor, in turn, asked broad questions regarding the gender of the "majority" of offenders, whether the majority of offenders have a close relationship with their victims, whether the size of the perpetrator can have an impact on helplessness, and why a child might appear to be smiling when describing abuse, and Dr. Carmichael's responses were based on the general class of victims, not the specifics of the case. The prosecutor did not ask hypothetical questions that incorporated "the exact same facts and details" included in any reports of interviews or examinations of T.M. or L.M. (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 ["Where, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence."].)

*"Quantitative" Testimony*

Citing to *Lapenias*, *supra*, 67 Cal.App.5th at page 179; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 570–571 (*Wilson*); and *People v. Julian* (2019) 34 Cal.App.5th 878, 883–886 (*Julian*), defendant lastly claims Dr. Carmichael's testimony that the majority of abusers are male and have a close relationship with their victim was impermissibly "quantitative." However, these cases are inapposite.

9

All three concerned statistical or quantitative testimony about the infrequency of *false allegations* of sexual abuse. (*Lapenias, supra*, 67 Cal.App.5th at p. 179 [expert testimony that it was " 'rare' for children to make false allegations of sexual abuse" violated rule that expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty]; *Wilson, supra*, 33 Cal.App.5th at p. 570 [statistical evidence regarding percentages of false allegations of sex abuse "had the effect of telling the jury there was at least a 94 percent chance" a child sex abuse victim was telling the truth]; *Julian, supra*, 34 Cal.App.5th at p. 886 [expert's 92 to 99 percent probability evidence invited jurors to find the defendant guilty based on statistical probabilities].)

The testimony defendant challenges, by contrast, did not serve to bolster the witnesses' credibility by telling the jury they were likely telling the truth. (See *Sedano, supra,* 88 Cal.App.5th at p. 481 [statistical evidence 94 percent of abusers had a pre-existing relationship with an abused child did not "improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do" but rather helped "the jury objectively 'evaluat[e] the credibility of an alleged child victim' "].) Defendant contends *Sedano* was wrongly decided because statistical evidence about pre-existing relationships with abusers is assertedly unnecessary to target a misconception about childhood sexual abuse and permits the jury to decide a defendant is guilty based on "profile" evidence. However, the *Sedano* court drew an important distinction, and one with which we agree, between statistical evidence about the infrequency of false allegations of child abuse, which does *not* address a common misconception about children who are

10

sexually abused, and statistical evidence showing most abused children are in a relationship with their abuser, which does.[3] (*Sedano*, at pp. 481–483.)

***Jury Instruction***

Defendant also challenges the jury instruction on CSAAS testimony, a version of CALCRIM No. 1193, given in this case. He maintains the language of the instruction was ambiguous and likely misled the jury to believe it could consider the CSAAS testimony as evidence of his guilt.

As a threshold matter, the Attorney General maintains defendant forfeited his claim of instructional error given that he requested the instruction given, made no claim the language was ambiguous, and did not suggest alternative language or request an alternative instruction (such as CALJIC No. 10.64 which he now maintains is a clearer instruction) that would have cured the assertedly ambiguous language. Generally, when a defendant has requested an instruction he later attempts to challenge on appeal, he will be foreclosed from doing so under the "invited error" doctrine. (See *People v. Lucero* (2000) 23 Cal.4th 692, 723 ["doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction"].) And generally, a defendant's "failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Nevertheless, as the parties recognize, an appellate court "may also review any instruction given, refused

---

[3] Given that Dr. Carmichael's testimony was properly admitted, there is no merit to defendant's additional claim that his constitutional rights were abridged by its admission. (See *People v. Jones* (2013) 57 Cal.4th 899, 949; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

11

or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259.) Accordingly, we will exercise our discretion to consider defendant's challenge to the instruction. (See *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

CALCRIM No. 1193 has been repeatedly upheld by the courts. (See *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176 ["[CALCRIM No. 1193] accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence"]; *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*).)

Defendant asserts none of these decisions is instructive because he raises a different challenge—that the instruction was "ambiguous" due to the "double negative" in its third sentence. Specifically, defendant claims the language "You may consider this evidence only in deciding whether or not [T.M.] and [L.M.]'s conduct were *not inc*onsistent with the conduct of someone who has been molested, and in evaluating the believability of her [*sic*] testimony" (italics added), can have different meanings and a juror could reasonably read "not inconsistent" to mean "consistent" and thus use the CSAAS testimony as evidence he committed the charged crimes.

However, read in context and in its entirety, the instruction did not allow the jury to find defendant guilty on the basis of the CSAAS evidence. To begin with, the second sentence of the instruction expressly told jurors the CSAAS testimony was "not evidence that the defendant committed any of the crimes charged against him." And read as a whole, the language of the instruction clearly conveyed that CSAAS testimony seeks to explain why certain behavior does not, contrary to common opinion, suggest a victim's

12

allegations are false. In addition, Dr. Carmichael expressly stated CSAAS is an educational tool, is "not used as a checklist," and is not used to "diagnos[e]" sexual abuse or determine whether a child has been sexually abused. (See *Gonzales, supra,* 16 Cal.App.5th at p. 503 [CSAAS instruction "must be understood in the context of [the CSAAS expert's] testimony"].) In short, a reasonable juror would understand the "not inconsistent" language to mean the jury could use the CSAAS testimony "to conclude that [the victim's] behavior [did] not mean [the victim] lied . . . [about being] abused."[4] (*Gonzales,* at p. 504.)

Nor is there any merit to defendant's assertion that CALCRIM No. 1193 is even more confusing when read in conjunction with CALCRIM No. 226, which informed the jury it could consider "anything that reasonably tends to prove or disprove the truth or accuracy" of testimony. Not only is CALCRIM No. 1193 a more specific instruction that any reasonable juror would understand pertains to and limits the use of CSAAS testimony, but Dr. Carmichael expressly testified to the limitations of such testimony.

In sum, it was not reasonably likely any juror understood the instruction that was given as allowing the use of the CSAAS testimony as evidence defendant committed the charged crimes, and the trial court did not commit instructional error.

### Cumulative Error

Because the trial court did not err in admitting the CSAAS testimony or in instructing the jury, defendant's claim of cumulative error also fails.

---

[4] That defendant could have requested CALJIC No. 10.64, which he maintains is a clearer instruction, is irrelevant to whether the CALCRIM No. 1193 that was given here was ambiguous and allowed the jurors to use the CSAAS testimony as "evidence that the defendant committed any of the crimes charged against him."

(See *People v. Capers* (2019) 7 Cal.5th 989, 1017 [no cumulative error where there are "no errors to aggregate"].)

## DISPOSITION

The judgment is AFFIRMED.

_____

Banke, Acting P. J.


We concur:


_____

Langhorne Wilson, J.


_____

Castro, J.*


**Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A166353, People v. Mason